CLERK'S OFFICE U.S. DISTRICT COURT AT
ROANOKE, VA
FILED

6/4/2026
LAURA A. AUSTIN, CLERK
BY: s/C. Kemp
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

| | | |
|---|---|---|
| BILLY D., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No: 4:25-cv-00037 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| COMMISSIONER OF SOCIAL SECURITY, | ) | By:    Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

Plaintiff Billy D. ("Billy") filed suit in this court seeking to overturn the Commissioner of the Social Security Administration's ("Commissioner's") final decision denying his claim for disability insurance benefits ("DIB") under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401–434. Billy suffers from anxiety, depression, bipolar disorder, post-traumatic stress disorder ("PTSD"), and schizoaffective disorder. On review of his application for DIB, an administrative law judge ("ALJ") concluded that, despite these conditions, Billy could still perform a full range of work with additional, non-exertional limitations. Billy challenges that conclusion. Because the ALJ improperly discounted Billy's account of his symptoms, the court will remand this case for further consideration.

## I.    STANDARD OF REVIEW

The Act authorizes this court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. § 405(g); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The court's role, however, is limited; it may not "reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (internal quotation omitted).

Instead, the court, in reviewing the merits of the Commissioner's final decision, asks only whether the ALJ applied the correct legal standards and whether "substantial evidence" supports the ALJ's findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000).

In this context, "substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation omitted). It is "more than a mere scintilla" of evidence, *id.* (internal quotation omitted), but not "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487– 89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam) (internal quotation omitted). But "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Social Security ALJs follow a five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) has been working, (2) has a severe impairment that

satisfies the Act's duration requirement, (3) has an impairment that meets or equals an impairment listed in the Act's regulations, (4) can return to past relevant work (if any) based on his RFC, and, if not, (5) whether he can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II.    RELEVANT PROCEDURAL HISTORY AND EVIDENCE

### A.  Procedural History

On April 21, 2022, Billy filed an application for DIB, alleging disability beginning on February 1, 2019.[1] (R. 17, 36–37.) His date last insured ("DLI")—the date on which he last met the Act's insurance requirement, which is a prerequisite to receiving benefits—was June 30, 2024. (R. 18.) The DLI is the date by which he must establish disability to receive benefits. Billy also filed an application for Supplemental Security Income on May 13, 2022. (R 182–88.) That claim was denied on August 12, 2022. (R. 105–09.)

Billy alleged disability due to serious mental illnesses—specifically, bipolar II disorder, depression, "hear[ing] voices and see[ing] things sometimes," and anxiety. (R. 189–195, 225.) Billy's claim was initially denied on August 12, 2022, and again upon reconsideration on July 28, 2023. (R. 17.) Billy requested a hearing and, along with his counsel, appeared before ALJ Brian Rippel on April 3, 2024. (R. 17.) ALJ Rippel denied Billy's claim on June 10, 2024. (R.

---

[1] Billy originally claimed disability beginning on January 1, 2013. (R. 17.) At the hearing, with the advice of counsel, Billy moved to amend his alleged onset date of disability to February 1, 2019. (R. 17, 36–37.) The ALJ granted that motion. (*Id.*)

14–26.) In summary, the ALJ concluded that Billy suffered from several severe medical impairments—specifically, anxiety disorder, depressive disorder, bipolar disorder, PTSD, and schizoaffective disorder—but that he retained the residual functional capacity ("RFC") to perform a full range of work, with some non-exertional limitations. (R. 22.) Because a significant number of jobs exist in the national economy that an individual with Billy's limitations could perform, the ALJ reasoned that he was not disabled within the meaning of the Act. (R. 25–26.)

On August 11, 2024, Billy requested that the Appeals Council review the unfavorable decision, but the Appeals Council denied the request for review on June 3 2025, making the ALJ's decision the final word of the Commissioner. (R. 1–4.) On July 29, 2025, Billy filed suit, seeking this court's review. (Compl. [ECF No. 1].)

## B. Legal Framework

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week, despite his medical impairments and related symptoms. SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). The ALJ makes the RFC finding between steps three and four of the five-step disability determination. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 659 (4th Cir. 2017) (citing 20 C.F.R. § 404.1520(e)). "This RFC assessment is a holistic and fact-specific evaluation; the ALJ cannot conduct it properly without reaching detailed conclusions at step [two] concerning the type and [functional] severity of the claimant's impairments." *Id.*

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because the RFC

is, by definition, "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work[-]related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). The RFC should reflect credibly established "restrictions caused by medical impairments and their related symptoms"— including those that the ALJ found "non-severe"—that impact the claimant's "capacity to do work-related physical and mental activities" on a regular and continuing basis. SSR 96-8p, 1996 WL 374184, at *1–2.

Second, the ALJ's decision must include a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explain how he weighed any inconsistent or contradictory evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Generally, a reviewing court will affirm the ALJ's RFC findings when he considered all the relevant evidence under the correct legal standards, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017), and the written decision built an "accurate and logical bridge from that evidence to his conclusion[s]," *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000); *see Shinaberry v. Saul*, 952 F.3d 113, 123–24 (4th Cir. 2020); *Thomas*, 916 F.3d at 311–12; *Patterson*, 846 F.3d at 662–63.

## C. Medical Evidence

As noted below, the court finds that the ALJ erred in considering Billy's account of the nature, severity, and frequency of the symptoms of his mental illnesses. Accordingly, it will

not summarize the entire medical record.[2] But the court will summarize evidence related to Billy's anxiety, depression, bipolar disorder, PTSD, and schizoaffective disorder, insofar as it is relevant to the issues at hand.

In 2016, after his release from a 14-month term of imprisonment, Billy saw Psychiatric Mental-Health Nurse Practitioner ("NP") Marlene Adams. (R. 854–72.) He reported that he first received treatment for his mental health in 2006, and that he continued to be treated through his period of incarceration. (R. 869.) His mental-status examinations during this period consistently revealed moderate to severe depression and anxiety. (*Id.*) NP Adams diagnosed him with bipolar affective disorder—he had previously been diagnosed with depression and anxiety, according to her notes—and adjusted his medications. (R. 871.) During follow-up appointments, Billy showed signs of passive suicidal ideations and paranoia, but no signs of hallucinations. (R. 821–59.)

In September and October 2016, at the request of a counselor, Billy saw Shawn Harrison of Piedmont Community Services. (R. 700.) Billy reported that he had abstained from drug use but continued to "struggle with paranoia and panic," which stemmed from social interactions. (R. 700–04.) Billy also reported difficulty concentrating and "feelings of worthlessness," but he did not report suicidal ideations, homicidal ideations, or self-injurious behaviors. (R. 704.) He also reported chronic worrying and that he "knows he must take his medication in order to avoid" suicidal thoughts. (R. 705–08.)

---

[2] That is, the court omits information pertaining to Billy's vision issues, as the ALJ did not deem them severe impairments, and Billy does not contest that determination. (R. 20 (concluding that Billy's alleged right-eye impairments were non-severe and observing that "the claimant noted that he felt his vision was stable and denied functional issues").)

On July 5, 2017, Billy was admitted to the emergency room following a methamphetamine overdose. (R. 428–42.) Intake notes indicate that Billy's then-wife stated that Billy "wanted to die and had threatened to kill himself," and that he had not been compliant with his medication regimen since April. (R. 428.) Billy remained hospitalized for the next few days, and on July 10, 2017, he denied current suicidal or homicidal ideations, and "delusions and paranoia [were] not evident." (R. 414–94.) Treatment notes indicate that, though Billy described that he was feeling depressed and presented as anxious, he was cooperative, made good eye contact, did not display signs of psychomotor agitation, and showed intact cognition and thought processes. (R. 473.) He was discharged from the hospital several days later with diagnoses of severe depression and substance-use disorder. (R. 419, 427, 484, 713.)

Following his hospitalization, Billy saw several providers, including Dr. Don Tessman, NP Adams, and a counseling resident, Traketa Wade, for psychiatric evaluations. (R. 711–27, 830–33.) Treatment notes reflect that he had appropriate thought processes and fair judgment and insight, with no signs of abnormal or psychotic thoughts. (R. 711.) He was diagnosed with major depressive disorder, adjustment disorder with mixed anxiety and depressed mood, and various substance-use disorders. (R. 711, 718.) Billy reported that his "intent was to kill himself by overdosing on meth" in July, and that he had attempted suicide even before that overdose. (R. 714.) He also told his providers that he suffered verbal and mental abuse from his parents as a young adult. (R. 715.)

Billy continued to receive treatment through the end of 2017, into 2018, although records indicate that he was discharged at Piedmont Community Services on September 18,

2017, despite his current "serious mental illness," for noncompliance with the program. (R. 733–34.) Billy also tested positive for opiate use during this time. (R. 821–23.)

On January 30, 2018, Billy was again transported to the emergency room with "altered mental status and drug overdose." (R. 372.) Treatment notes indicate that Billy "presented to the outside hospital with altered mental status, delusions, hallucinations, severe agitation, [and] diaphoresis insomnia for the last 3 days." (*Id.*) Billy's wife noted "that his behavior was so alarming [that] she asked him to leave home," and that he had not been taking his antipsychotic medications for the past week. (*Id.*) Emergency medical services reported that, when they picked him up from his home for transport, "he was physically slamming his head on a table and was extremely agitated" and needed to be intubated. (R. 341–42.) Billy reported that this overdose was not on purpose but that "he sees shadow people[] and hears whispers." (R. 341–42.) Billy received treatment and was diagnosed with acute encephalopathy caused by methadone and amphetamine use. (R. 341–403.) Providers noted that, while Billy was receiving treatment, he grew agitated, began hallucinating, and was continuously disoriented. (R. 381.) On February 5, 2018, he was discharged with diagnoses of bipolar 1 disorder, substance-induced mood disorder, anxiety, and substance-use disorder. (R. 345.)

Billy continued to see NP Adams through 2018, who noted that Billy was complying with his medication regimen of lithium, Risperdal, Prozac, and Trazodone. (R. 743–55.) During this time, Billy continued to show symptoms of bipolar and schizoaffective disorder, such as mood swings, racing thoughts, depressive episodes, and delusions. (R. 743.)

Billy saw several providers, including NPs Tracy Lange, Tracie Hampton, and Felicia McBride, from mid-2018, into 2020. (R. 792–820.) These providers continued his medication

regimen with only slight modifications. (*Id.*) In mental-status exams, Billy showed good eye contact, cooperation, normal speech, euthymic mood, appropriate affect, and normal thought processes, with no signs of hallucinations or suicidal ideations. (R. 793, 796.) Treatment notes indicate, however, that Billy reported paranoia if he missed his medications.[3] (R. 801.)

On March 2, 2021, Billy saw Dr. George Martin for a follow-up appointment. (R. 782–84.) Dr. Martin conducted a general exam, noting that Billy was alert, made good eye contact, had good hygiene, denied hallucinations and suicidal ideations, showed stable affect, was "socially appropriate," and "was not particularly distractible." (R. 779.) Dr. Martin diagnosed him with bipolar disorder. (R. 780.)

On March 31, 2021, Billy presented for treatment after he was hospitalized for seizures. (R. 774.) NP Amanda Keith referred Billy to a neurologist. (R. 775–76.) Billy did not see the neurologist, but during a follow-up appointment on May 24, he denied having additional seizures. (R. 771–73.) On that day, Dr. Mary Varghese again diagnosed him with bipolar disorder and altered mental status. (R. 772.)

Billy continued to receive treatment from his providers through 2022. (R. 764–70.) On May 24, 2022, Billy presented to NP McBride, complaining that "the Prozac was not working for him at all, he was staying down all the time, not wanting to do anything . . . and that he felt like he had no energy to do anything." (R. 761 (cleaned up).) He stated that he lost a job recently due to his symptoms. (*Id.*)

---

[3] Treatment notes indicate that Billy said he was working and needed a work note at the March 22, 2019 appointment. (R. 801.) His alleged onset date is February 1, 2019. (R. 17.)

On June 20, 2022, Billy saw NP Hampton for a psychiatric evaluation. (R. 977–84.) He reported having "no energy," paranoid thoughts, and that "he is irritable most days, depressed, [has] poor appetite, feel[s] helpless, hopeless, and [has] hypersomnia." (R. 977.) NP Hampton diagnosed him with PTSD, schizoaffective disorder, bipolar disorder, and anxiety. (R. 979.) Billy saw NP Hampton again on July 18, 2022, for a follow-up appointment. (R. 981–84.) Billy reported somewhat-improved paranoia but continued to experience symptoms of depression and bipolar disorder, so NP Hampton adjusted his medications. (*Id.*) During follow-up appointments with NP Hampton in August and October 2022, Billy reported that, while he experienced decreased hallucinations and improved sleep, he continued to experience paranoia and a depressed and anxious mood. (R. 996–1007.) NP Hampton diagnosed him with panic disorder and prescribed him buspirone. (R. 1001–02.)

Between March 23 and April 24, 2023, Billy again saw NP Hampton and reported feeling "antsy and nervous" and his belief that "something awful is going to happen." (R. 1014, 1019–24.) He continued to avoid social interaction, but denied suicidal or homicidal thoughts or delusions. (*Id.*) He reported no improvement in anxiety symptoms. (*Id.*) But he denied feeling depressed or having feelings of hopelessness. (*Id.*) NP Hampton noted that Billy was alert and demonstrated euthymic mood. (R. 1017.) She diagnosed him with schizoaffective disorder, bipolar disorder, PSTD, anxiety, and panic disorder, and she discontinued the buspirone. (R. 1017–18.)

Billy continued to receive treatment from NP Hampton in June and July 2023. (R. 1044–64.) He reported that his symptoms had worsened because he stopped taking his medications for "a few months." (R. 1058.) He stated that he sometimes forgot to take his

medications and did not like the side effects. (*Id.*) He denied suicidal ideations, but admitted to using methamphetamine three days before the visit. (*Id.*)

On July 5, 2023, Billy voluntarily admitted himself to the Laurel Recovery Center, as he admitted to using methamphetamine daily and having suicidal thoughts. (R. 1050–51, 1114–16.) He left on July 9 before completing treatment and declined an offer to arrange for aftercare services. (*Id.*) Treatment notes indicate that he made limited progress on account of low motivation and lack of participation. (R. 1114, 1117–1201.) Billy returned to NP Hampton the next day and reported symptoms of anxiety, depression, and psychosis, including suicidal thoughts. (R. 1050–56.) NP Hampton modified his medications. (R. 1048.) Billy followed up with NP McBride on July 27 and NP Hampton on July 28, reporting the same symptoms. (R. 1044–49, 1261–64.)

On July 25, 2023, NP Hampton drafted a letter describing Billy's diagnoses and symptoms. (R. 1026.) She opined that Billy was "not mentally capable of obtaining employment" at that time. (*Id.*)

Between October and December 2023, Billy saw NP Hampton for follow-up appointments, where he complained about racing thoughts, sleep disturbance, lack of motivation, uncontrollable worrying, and fatigue. (R. 1029–34.) Objective mental-status exam findings were unchanged from his last exam, and NP Hampton adjusted his medications. (R. 1033–34.)

Finally, on March 6, 2024, Billy again saw NP Hampton and reported that he was still experiencing difficulty sleeping, maintaining energy levels, and anxiety. (R. 1203.) He denied experiencing psychotic symptoms or side effects from his medications. (R. 1203–04.) NP

Hampton conducted a mental-status exam and observed that Billy "has multiple stressors complicating his psychiatric disorders," and that he was severely depressed. (R. 1206.) NP Hampton diagnosed Billy with schizoaffective disorder, bipolar disorder, anxiety, PTSD, and panic disorder. (R. 1206–07.)

## D. Opinion Evidence

Richard Milan, Jr., Ph.D., a state-agency psychological consultant, performed an initial review of Billy's SSA disability application on August 12, 2022.[4] (R. 62–71.) Dr. Milan determined that Billy was not disabled, but that he had moderate limitations with interacting with others and concentrating, persisting, or maintaining pace. (R. 67.) He also opined that Billy was moderately limited in his ability to carry out detailed instructions, maintaining attention and concentration for extended periods, working in coordination with or in proximity to others without being distracted by them, completing a normal workday or workweek without interruptions from his mental impairments, interacting appropriately with the general public, and getting along with coworkers without distracting them or exhibiting behavioral extremes. (R. 69.) Despite these limitations, Dr. Milan opined that Billy would be able to complete simple, routine tasks over a normal workweek, provided he had minimal social demands. (R. 69.)

Joseph Leizer, Ph.D., a state-agency psychological consultant, reconsidered Billy's disability application on July 28, 2023.[5] (R. 80–97.) Dr. Leizer found Dr. Milan's conclusions "credible and useful," and concurred that Billy had moderate limitations in interacting with

---

[4] Disability Examiner Shanna Hunt reviewed Dr. Milan's conclusions. (R. 71.)

[5] Disability Examiner Clinton Harris reviewed Dr. Leizer's conclusions. (R. 97.)

others and concentrating, persisting, or maintaining pace. (R. 83, 93.) Dr. Leizer also agreed that Billy was moderately limited in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted by them, complete a normal workday or workweek without interruptions from his mental impairments, interact appropriately with the general public, and get along with coworkers without distracting them or exhibiting behavioral extremes. (R. 94.) Despite these limitations, Dr. Leizer concluded that Billy "would be capable of performing the simple and repetitive tasks required to meet the basic mental demands of competitive work." (R. 95.)

## E. Testimonial Evidence

On July 6, 2022, Billy completed an Adult Function Report and stated that he has difficulty working with others. (R. 258–65.) In the Report, he testified that he "lay[s] in bed because of mental disability," but that he will occasionally do yard work with "encouragement." (R. 260.) He testified that he goes outside "some," but mainly stays inside to watch TV and play on his phone. (R. 262.) Billy also testified that he was previously fired from a job for "mental reasons." (R. 263.) Finally, he stated that his medications at the time made him tired and dizzy and made it difficult to focus, understand, and remember things. (R. 265.) On November 9, 2022, Billy filed an addendum to his Adult Function Report,[6] stating that, since his last Function Report in 2022, he started experiencing hallucinations, started hearing voices, became severely depressed and unsociable, and had mood swings. (R. 270.)

---

[6] Billy filed this addendum—as well as the addendum submitted in 2023—pursuant to his appeals of unfavorable decisions.

- 13 -

On April 18, 2023, Billy filed a second Adult Function Report. (R. 291–98.) He testified that he has difficulty sleeping, hears voices, and is paranoid "all day." (R. 292.) He reiterated that he has difficulty focusing, remembering, thinking, and sometimes "forget[s] to [take his] meds and shave and eat." (R. 292–93.) He filed an addendum to this second Adult Function Report on October 3, 2023, stating that his paranoia had worsened and he did "not trust anyone." (R. 300–06.)

On April 18, 2023, Billy's mother, Rebecca Davis, completed a Third-Party Adult Function Report. (R. 275–82.) She stated that she assists Billy around the house and notices that he "feel[s] the urge to run and hide around people, he is unable to associate with people, and . . . without his medicines[,] he sees ghost[s and] hears voices, [and] acts crazy." (R. 276.) Ms. Davis testified that she helps him with daily meals and his personal care. (R. 276–78.) She added that Billy has no income, has difficulty focusing, rarely socializes aside from family and his girlfriend, needs supervision, and "does not read or spell well." (R. 278–82.)

On April 3, 2024, Billy appeared for his hearing with ALJ Rippel via videoconference. (R. 34–61.) Billy testified to the impacts of his anxiety, stating that he "tr[ies] to run away from everything and it gets in the way of [him] socializing with people" and that people are the main trigger for his anxiety. (R. 42.) He stated that he has visited the hospital for panic attacks, which occur "whenever [he goes] out in public." (R. 43.) He testified that he has difficulty focusing because he will "hear something or something will [pique his] attention and [he] lose[s his] train of thought." (R. 50.) Billy also testified to the symptoms of his depression, schizoaffective disorder, and PTSD. He stated that he has attempted suicide multiple times and that he "mainly stays in [his] room" or house for most of the day. (R. 44, 49, 53.) Billy

- 14 -

also stated that he hears voices or whispers—sometimes voices that encourage him to commit

suicide—which he said causes his aggression towards people, panic attacks, nightmares, and

blackouts.[7] (R. 44–45.)

Billy also testified about his history of substance abuse.[8] Specifically, he explained that

he used drugs to self-medicate and cope with depression. (R. 46–47.) He stated that he has

been hospitalized for mental-health issues and for drug overdoses; after one overdose, he was

"on life support for like nine [days]." (R. 46.) Billy also testified about the side effects of his

medications. According to him, Invega Sustenna, a medication that was prescribed for his

schizoaffective disorder, causes drowsiness, aches, occasional sickness, difficulty breathing,

and hot and cold chills. (R. 48.) His other medications—Seroquel, buspirone, and

Wellbutrin[9]—make him tired, though he has difficulty getting restful sleep. (R. 48–49, 50–51.)

He also stated that he feels weak, dizzy, and jittery. (R. 49.) Billy stated that he assists with

chores at home—where he lives with his girlfriend, mom, and dad—including cleaning and

cutting the grass. (R. 51–52.) But Billy testified that he cannot stay outside long because

"someone comes out of the woods" and watches him. (R. 52.)

---

[7] Billy stated that he

> hears things, but that—they don't ever talk to me. They always take my things
> and hide it from me and they just misplace my stuff and they—and I go crazy,
> because I think I can't find my stuff. I just put it down carrying stuff and
> everything and then nobody believes me when I tell them what I see. Nobody
> believes me and then it makes me look stupid and it gets to the point where
> I can't take it no more. I just want to give up.

(R. 47.)

[8] Billy testified that, at the time of the hearing, he had not used illicit substances in months. (R. 47–48.)

[9] Billy also takes Clonidine for his mental symptoms, although he maintained that it does not cause him any
side effects. (R. 49.)

Linda Augins, a vocational expert ("VE"), also testified at the April 3 hearing. (R. 55–60.) In response to the ALJ's hypotheticals, the VE opined that a person with Billy's conditions could not perform Billy's past work in construction. (R. 56.) The VE, however, testified that a person with Billy's conditions could perform work as a janitor (DOT code 381.687-010), salvage laborer[10] (DOT code 821.667-010), or laundry folder (DOT code 369.687-018). (R. 56.) But the VE testified that, if a person with Billy's conditions needed additional breaks and would be off task greater than 10% of the time or would need special supervision, he could not perform any of the listed jobs. (R. 58–59.)

## F.  The ALJ's Opinion

The ALJ concluded that Billy suffered from anxiety disorder, depressive disorder, bipolar disorder, PTSD, and schizoaffective disorder, which are severe impairments. (R. 20 (citing 20 C.F.R. §§ 404. 1520(c), 416.920(c)).) He found, however, that Billy did not suffer from "an impairment or combination of impairments" that met or medically equaled one of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1. (R. 20.) "After careful consideration of the entire record," the ALJ determined that Billy had the RFC to perform a full range of work at all exertional levels, but with the following non-exertional limitations:

> [Billy is] limited to jobs that require understanding, remembering, and carrying out simple instructions and using judgment to make simple work-related decisions; cannot perform work requiring a specific production rate such as assembly line work or work that requires hourly quotas; [is] limited to only occasional interaction

---

[10] The ALJ asked the VE if limited peripheral vision and depth perception would eliminate any of the professions that she listed. (R. 56–57.) The VE stated that those limitations would preclude the salvage laborer position, but the VE provided a substitute position of routing clerk (DOT code 222.687–022). (R. 57.)

> with the public, coworkers, or supervisors; [and is] limited to
> dealing with only occasional changes in a routine work setting.

(R. 22.) As a result, the ALJ determined that, while Billy is unable to perform any past work,

he can perform jobs that exist in significant numbers in the national economy. (R. 25–26.) The

ALJ therefore concluded that Billy was not disabled, as defined in the Act, from the alleged

onset date through the date of the decision.[11] (R. 26.)

### III.    ANALYSIS

Billy challenges the ALJ's decision on two grounds. First, he argues that the ALJ did

not adequately explain how the work restrictions in the RFC account for Billy's functional

limitations listed in 20 C.F.R. § 404.1520a(c)(3). (Pl.'s Br. at 21–27 [ECF No. 16].) Second, he

argues that the ALJ erred in assessing Billy's account of the effects of his mental illnesses. (*Id.*

at 27–29.) The Commissioner opposes both arguments, maintaining that the ALJ's decision is

based on substantial evidence. (*See* Def.'s Br. at 5–18 [ECF No. 20].) Because the court agrees

with Billy as to the second argument, it will not reach the first.

When assessing an RFC, an ALJ must consider the limiting impacts of a claimant's

physical and mental impairments. 20 C.F.R. §§ 404.1545(a)(1)–(3). When an ALJ considers an

impairment with "[s]ymptoms [that] cannot always be measured objectively through clinical

or laboratory diagnostic techniques," ALJs must conduct a unique, two-step analysis in

evaluating those subjective complaints. SSR 16-3p; *see also* 20 C.F.R. § 404.1529(a); *Arakas v.*

*Comm'r, Soc. Sec. Admin.*, 983 F.3d 83, 95 (4th Cir. 2020). At the first step, the ALJ must consider

---

[11] The ALJ determined that Billy "ha[d] not been under a disability . . . from January 1, 2013, through the date of [the] decision," though the ALJ recognized previously that Billy amended his alleged onset date to February 1, 2019. (R. 17, 20, 26.) For the purposes of this Memorandum Opinion, the court considers February 1, 2019, as Billy's alleged onset date.

"whether objective medical evidence presents a 'medically determinable impairment.'" *Id.* (quoting 20 C.F.R. § 404.1529(b); SSR 16-3p, 2016 WL 1119029, at *3). Here, ALJ Rippel found that Billy's anxiety, depression, bipolar disorder, PTSD, and schizoaffective disorder were medically determinable impairments that could reasonably be expected to cause his symptoms, so he proceeded to the second step. (R. 20.)

At the second step, the ALJ "evaluate[s] the intensity and persistence of [the claimant's] symptoms" to determine the extent to which the symptoms limit an individual's ability "to perform work-related functions." SSR 16-3p, 2016 WL 1119029, at *2. At this stage, the claimant may rely solely on subjective testimony or evidence to establish his impairment, *Hines*, 453 F.3d at 565, and objective evidence is not required to find the claimant disabled, *see* SSR 16-3p 2016 WL 119029, at *4–5 ("Symptoms cannot always be measured objectively through clinical or laboratory diagnostic techniques."). Accordingly, under *Arakas*, the ALJ "may 'not disregard an individual's statements about the intensity, persistence, and limiting effects of symptoms solely because the objective medical evidence does not substantiate' them." 983 F.3d at 95 (quoting SSR 16-3p, 2016 WL 1119029, at *4–5). The ALJ, however, "is not required to accept the claimant's statements at face value; rather, the ALJ must 'evaluate whether the statements are consistent with the objective medical evidence and other evidence.'" *Piacitelli v. O'Malley*, No. 7:22-CV-193-FL, 2024 WL 996740, at *6 (E.D.N.C. Feb. 12, 2024) (quoting SSR 16-3p, 2016 WL 1119029, at *6); *see also Craig v. Chater*, 76. F.3d 585, 595 (4th Cir. 1996) (explaining that the ALJ must consider whether a claimant's subjective complaints could "reasonably be accepted as consistent with the objective medical evidence and other evidence"), *superseded by statute on other grounds*.

While *Arakas* was decided in the context of fibromyalgia—a physical disease with primarily subjective symptoms—courts in this Circuit have since applied the standard to the evaluation of mental illnesses, including depression, anxiety, bipolar disorder, PTSD, and schizoaffective disorder. *See, e.g., Shelley C. v. Comm'r of Soc. Sec. Admin.*, 61 F.4th 341, 361 (4th Cir. 2023) (holding "that depression—particularly chronic depression—is one of those other diseases" that does not produce objective medical evidence); *Lonnell J. v. Bisignano*, No. 24-3673-DRM, 2026 WL 693344, at *4 (D. Md. Mar. 12, 2026) ("[T]he Court finds that Plaintiff's medically determinable impairment [of] 'depressive, bipolar, and related disorders[]' . . . falls within *Shelley C.*'s extension of the *Arakas* holding."); *Stacy S.*, 2025 WL 2172687, at *6 (applying the *Arakas* standard to analyze case involving PTSD, depression, anxiety, bipolar disorder, schizoaffective disorder, and neurocognitive disorder). Thus, the court finds it appropriate to apply *Arakas* to Billy's claims, too.

When evaluating a claimant's subjective symptoms for consistency across the greater record, *see Piacitelli*, 2024 WL 996740, at *6, a court may compare a claimant's "hearing testimony to [his] previous statements, including those made during medical visits with [his] . . . provider," as well as the claimant's reported daily activities. *Lasharne W. v. Comm'r, Soc. Sec. Admin.*, No. SAG-21-2603, 2023 WL 2414497, at *4 (D. Md. Mar. 8, 2023); *see also Lonnell J.*, 2026 WL 693344, at *4 (noting that it was "not improper" for the ALJ to consider the claimant's previous conflicting statements about his symptoms, but that it was improper for the ALJ to reference "items which are not mere reports of [the claimant's] past subjective statements" in discounting the claimant's testimony); *Debbie M. v. Kijakazi*, No. 7:22-cv-00056, 2023 WL 4087414, at *8–9 (W.D. Va. June 20, 2023) (affirming ALJ's finding of no disability,

based on inconsistencies between claimant's hearing testimony about her symptoms and her previous reports to health providers about the lesser extent of her impairments). But because these psychiatric impairments "do[] not produce consistent objective findings, . . . an ALJ may not rely on such findings, even as one factor of many, to discount subjective complaints." *Crystal G. v. Bisignano*, No. CV 25-0771-DRM, 2026 WL 785043, at *4 (D. Md. Mar. 20, 2026) (citing *Shelley C.*, 61 F.4th at 360).

These principles are well-illustrated in *Lonnell J. v. Bisignano.* 2026 WL 693344, at *4–5. Lonnell suffered from chronic depression and testified about his symptoms, including memory issues, difficulty with social interaction, and suicidal ideations. *Id.* at *4. Although the ALJ acknowledged Lonnell's complaints, he ultimately determined that Lonnell was not disabled, noting that he had reported to providers, on some occasions, that he was improving. *Id.* The ALJ buttressed his conclusion with objective medical evidence, including "providers' clinical interpretations of their observations, including multiple characterizations of Plaintiff's affect, orientation, demeanor, eye contact, participation, and mood, describing them as 'normal,' 'good,' 'neutral,' 'euthymic,' and 'appropriate.'" *Id.* at *5. But, on appeal, the magistrate judge held that, though the ALJ permissibly compared Lonnell's hearing testimony to his past statements to providers, he erred by using this objective evidence to discredit Lonnell's testimony about the intensity of his depression:

> The presumed relevance of these normal findings is that they imply the absence of "[p]sychiatric signs" of depression, persistent depression, and [major depressive disorder]—and therefore a lack of "objective medical evidence" supporting Plaintiff's testimony about his symptoms of these disorders. In context, the ALJ's discussion of these findings suggests he engaged in the analysis forbidden by *Arakas* and *Shelley C.*: "rely[ing] on objective medical evidence (or the lack thereof)—

even as just one of multiple factors—to discount a claimant's subjective complaints regarding symptoms of" chronic depression.

*Id.* Because the ALJ discredited Lonnell's subjective statements with objective medical evidence, the magistrate judge remanded the decision for further consideration.[12] *Id.*

Here, the ALJ engaged in the same "forbidden" analysis by discounting Billy's subjective symptoms with objective evidence—mainly cherry-picked observations of his clinical presentation and demeanor. *Id.* In concluding that Billy's "statements concerning the intensity, persistence[,] and limiting effects of [his] symptoms are not entirely consistent with" the other evidence in the record, ALJ Rippel began with a cursory recitation of Billy's testimony, acknowledging his purported issues with memory, social interaction, concentration, paranoia, and energy levels. He also considered Billy's mother's testimony concerning the sedative effects of his medications. (R. 22.) But then the ALJ indicated that he would "[t]urn[] now to the objective evidence." (R. 23.) In so doing, he highlighted that treatment notes in the record reported otherwise "normal" results during mental-status exams. (R. 23–24 (taking note of, *e.g.*, Billy's normal thought processes, lack of delusional or suicidal ideations on certain occasions, intact cognitive functioning and fund of knowledge, cooperation, alertness, and "appropriate and euthymic mood").) Besides referencing a single instance of Billy reporting reduced symptoms (discussed below), the ALJ erroneously relied on and pitted the providers' impressions of Billy's mental status against Billy's own representations, thereby reaching an impermissible conclusion: "the absence of '[p]sychiatric signs' of [mental impairments]—and

---

[12] The case was referred to the magistrate with the consent of the parties. *See Lonnell J.*, 2026 WL 693344, at *1.

therefore a lack of 'objective medical evidence' supporting [Billy's] testimony about his symptoms of these disorders." *Lonnell J.*, 2026 WL 693344, at *5 (first brackets in original); *cf. Lasharne W.*, 2023 WL 2414497, at *4.

Indeed, the ALJ stated that he found Billy's statements about the limiting effects of his symptoms "inconsistent because the record shows a[n] improvement in the management of the claimant's mental health symptoms." (R. 23.) Aside from citing the "normal" clinical findings—which, as discussed, cannot be used to discredit Billy's subjective complaints—the ALJ pointed out that, in December 2019, Billy "denied experiencing symptoms of panic attacks, racing thoughts, sleep disturbance, energy change, paranoia, and hallucinations."[13] (R. 23–24.) But this was an isolated, dated report, and, *without more*, the court cannot endorse the ALJ's "improvement" theory.

The court simply cannot overlook that, during medical exams from 2018 to 2023, Billy exhibited a depressed and anxious mood, paranoia, and complained of "hypersomnia, excessive worries, racing thoughts, and difficulty controlling his worries." (R. 23.) Specifically, NP Hampton's treatment notes show that Billy consistently reported some sort of mental health symptoms at appointments with no clear line of improvement, despite various modifications to his medication regimen (which, at best, only inconsistently managed his symptoms). (*See, e.g.*, R. 782–820, 977–84, 1014, 1019–24, 1044–64, 1029–34, 1050–56, 1203–04.) Most notably, he was also admitted to an inpatient recovery center for suicidal thoughts

---

[13] The ALJ also collapsed his discussion of Billy's mental symptoms into one truncated analysis. In so doing, he failed to explain how Billy's purported improvement in symptoms of some disorders (*e.g.*, paranoia or hallucinations) yielded improvement in others (*e.g.*, depressed or anxious mood) such that it would justify the finding of no disability.

- 22 -

in July 2023—less than a year before his hearing before ALJ Rippel—and testified that he was not responding well to his medications of late. (*Id.*) *See also Shelley C.*, 61 F.4th at 362 ("At the outset of his analysis, the ALJ inappropriately brushed off Shelley C.'s intentional overdose, which she admitted was a suicide attempt.").

To be sure, it is the ALJ's role to weigh conflicting evidence, and the mere presence of medical documentation favorable to a finding of disability does not invalidate an ALJ's contrary finding. *See Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014); *Fiske v. Astrue*, 476 F. App'x 526, 527 (4th Cir. 2012). But the ALJ failed to base his improvement theory— the primary reason that he discredited Billy's subjective allegations—on substantial evidence or explain how it applied across the broad spectrum of Billy's various, but distinct, mental illnesses. This error, along with the misapplication of *Arakas*, requires remand. *See Mascio*, 780 F.3d at 634.

## IV.    CONCLUSION

For the foregoing reasons, the court will remand the ALJ's finding that Billy is not disabled.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 4th day of June, 2026.

/s/ *Thomas T. Cullen*_____
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE